FEE DUE N/S

FILED
CLERK, U.S. DISTRICT COURT
07/29/2026
CENTRAL DISTRICT OF CALIFORNIA
BY mba DEPUTY
DOCUMENT SUBMITTED THROUGH THE ELECTRONIC DOCUMENT SUBMISSION SYSTEM

Mitchell Taylor Button
101 Ocean Sands Ct.
Myrtle Beach, SC 29579
843-780-8383
desmodynamica@gmail.com

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

MITCHELL TAYLOR BUTTON

PLAINTIFF,

V.

PAGE RAD individually, also known as

@norcal_lowlife5

DEFENDANT.

Case No: 8:26-cv-02065-FWS (RAOx)

**COMPLAINT**

**JURY DEMAND**

Plaintiff Mitchell Taylor Button ("Plaintiff" or "Button"), proceeding *pro se*, brings this action against Defendant Page Rad ("Defendant" or "Rad") and alleges as follows:

## NATURE OF THE ACTION

1. This action arises from Defendant Page Rad's deliberate publication of the statement **"Epstein associates car"** beneath a July 17, 2026 Instagram publication by Barrett-Jackson promoting a custom Ferrari F355 designed and built by Plaintiff and scheduled for auction at Barrett-Jackson's September 10–12, 2026 Las Vegas Auction.
2. Defendant's statement was not an innocent mistake, an unrelated joke, or commentary about the automobile itself.
3. Defendant knew Plaintiff personally. Defendant knew Plaintiff's history in the automotive industry. Defendant knew Plaintiff created the Ferrari featured by Barrett-Jackson. Defendant knew the professional relationships upon which Plaintiff's livelihood historically depended.

4. Most significantly, Defendant knew of the catastrophic reputational damage Plaintiff suffered after highly publicized sexual-assault allegations were asserted against Plaintiff in a civil lawsuit in 2021.
5. Those allegations have never been adjudicated at trial as true. Plaintiff denies them.
6. Nevertheless, the publicity surrounding those allegations devastated Plaintiff's reputation, career, businesses, professional relationships, and livelihood and drove Plaintiff from an automotive industry in which his work had previously achieved international recognition.
7. For approximately five years, Plaintiff remained largely absent from the automotive industry while attempting to rebuild the reputation and professional relationships destroyed beginning in 2021.
8. By 2026, those efforts were finally producing results. Plaintiff was reconnecting with individuals and businesses within the automotive community and rebuilding professional relationships.
9. Then, one of Plaintiff's most recognizable automotive creations unexpectedly returned to major industry attention when Barrett-

Jackson began promoting the vehicle for its September 2026 Las Vegas Auction.

10. Barrett-Jackson's promotional publication presented Plaintiff's work to an Instagram audience of approximately **1.5 million followers** and to precisely the automotive collectors, manufacturers, sponsors, media, enthusiasts, and industry professionals whose perception of Plaintiff matters to his professional rehabilitation.

11. Defendant chose that moment and that audience to resurrect the stigma of the 2021 allegations.

12. Defendant publicly labeled Plaintiff's recognizable professional work:

**"Epstein associates car"**

13. Defendant's invocation of Jeffrey Epstein had nothing whatsoever to do with the automobile's design, engineering, condition, ownership, performance, value, or upcoming auction.

14. It was directed at Plaintiff.

15. Defendant deliberately invoked one of the most notorious names associated with sexual abuse and exploitation to falsely associate Plaintiff and Plaintiff's professional work with Jeffrey Epstein.

16. Plaintiff has never been an associate of Jeffrey Epstein.

17. Defendant possessed no factual basis to state or imply otherwise.

18. Defendant's conduct was particularly malicious because this was not Defendant's first attempt to inject disparaging commentary about Plaintiff into Plaintiff's automotive relationships.

19. Years earlier, Defendant had posted unsolicited comments concerning Plaintiff and his vehicles directly on social-media accounts maintained by Plaintiff's sponsors and professional contacts.

20. Plaintiff confronted Defendant concerning that conduct both electronically and in person.

21. Defendant therefore knew precisely who Plaintiff was, knew the importance of Plaintiff's reputation, knew Plaintiff's professional network, and knew that publishing derogatory statements before Plaintiff's automotive-industry audience could inflict professional harm.

22. After Plaintiff confronted Defendant concerning the July 2026 publication, Defendant deleted his statement and immediately blocked Plaintiff.

23. Plaintiff had already preserved evidence of Defendant's publication.

24. Defendant's statement was knowingly and maliciously calculated to drag the stigma that devastated Plaintiff beginning in 2021 back into the automotive industry at precisely the moment Plaintiff's work was again receiving substantial positive attention.

## THE PARTIES

25. Plaintiff Mitchell Taylor Button is a natural person and citizen of the State of South Carolina.

26. Plaintiff resides in Myrtle Beach, South Carolina.

27. Defendant Page Rad is, upon information and belief, a natural person and citizen of the State of California.

28. Defendant resides in Huntington Beach, Orange County, California.

29. Defendant operates and/or controls the Instagram account **@norcal_lowlife5**.

30. At the time of the events alleged herein, Defendant's Instagram account had approximately 3,500 followers.

31. Plaintiff and Defendant knew one another through the Southern California automotive industry beginning approximately in 2017–2018.

## JURISDICTION AND VENUE

32. This Court has original subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff is a citizen of South Carolina, Defendant is a citizen of California, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

33. Plaintiff seeks damages exceeding $75,000 arising from Defendant's defamatory publication and resulting injury to Plaintiff's professional reputation, prospective economic relationships, professional rehabilitation, and economic interests.

34. Before the reputational destruction beginning in 2021, Plaintiff derived substantial economic value from his professional reputation, including sponsorship compensation exceeding approximately

$150,000 in connection with a single major automotive event, together with substantial additional sponsorships, collaborations, commissions, appearances, and professional opportunities.

35. These historical earnings demonstrate the substantial economic value associated with Plaintiff's professional reputation and the magnitude of the professional interests Defendant knowingly attacked.

36. This Court has personal jurisdiction over Defendant because Defendant is a California resident domiciled within this judicial district.

37. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in Huntington Beach, California, within Orange County and this judicial district. Federal law provides that a natural person resides for venue purposes in the judicial district where the person is domiciled.

38. Orange County falls within the Southern Division of the United States District Court for the Central District of California.

## FACTUAL ALLEGATIONS

### A. Plaintiff and Button Built

39. Plaintiff was the founder, principal creative force, and one of the individuals comprising the automotive team and brand known as Button Built, which designed and created custom vehicles that became internationally recognized within the automotive community between approximately 2014 and 2021.

40. Button Built vehicles received substantial national and international media exposure and became recognizable to automotive enthusiasts, manufacturers, sponsors, builders, photographers, event organizers, and other industry participants.

41. Plaintiff spent years developing Button Built as a recognized automotive brand through vehicle design, custom builds, social media, automotive publications, sponsorship relationships, event appearances, photography, videography, promotional work, and industry collaborations.

42. Plaintiff invested substantial time, labor, skill, creativity, and financial resources into developing Button Built and the goodwill associated with Plaintiff's automotive work.

43. Before the reputational harm beginning in 2021, Button Built had developed substantial goodwill, credibility, consumer recognition, and influence within the domestic and international automotive industry.

44. Plaintiff's vehicles were not generic automobiles. They were distinctive, heavily customized, widely published, and recognizable within the automotive community as Button Built creations.

45. Plaintiff was the principal visionary behind Button Built's vehicle designs, while the vehicles themselves—rather than Plaintiff personally—were ordinarily the public face of the brand.

46. Plaintiff's former Instagram account, **@button_built**, amassed nearly one-half million followers and subscribers before Plaintiff withdrew from social media in 2021.

47. The account principally functioned as an archive and showcase of the vehicles, fabrication, design, and work created by the Button Built team.

48. Plaintiff's professional opportunities were heavily reputation-driven. Sponsorships, collaborations, commissions, event opportunities, product relationships, and other economic opportunities routinely arose from industry visibility, public perception, professional reputation, and word-of-mouth relationships.

B. **Defendant's Longstanding Knowledge of Plaintiff**

49. Defendant was not a stranger who happened upon Plaintiff's vehicle on Instagram in July 2026.

50. Plaintiff became acquainted with Defendant through the Southern California automotive community approximately nine years earlier.

51. Defendant was familiar with Plaintiff, Button Built, Plaintiff's vehicles, Plaintiff's growing prominence within the automotive industry, and companies and individuals with whom Plaintiff maintained professional relationships.

52. Their history included a prior dispute concerning another of Plaintiff's Ferrari builds.

**C. The 1988 Ferrari 328 GTS and Defendant's Prior Online Conduct**

53. During approximately 2017–2018, Plaintiff owned a custom, modified **1988 Ferrari 328 GTS**.

54. Plaintiff delivered that vehicle to **Boden Autohaus**, an automotive business owned and operated by Josh Esfahani, for substantial automotive work.

55. Plaintiff paid Boden Autohaus approximately **$50,000** for work associated with the vehicle.

56. Substantial portions of the contracted work were not performed while the Ferrari remained in Boden Autohaus's possession.

57. Plaintiff was not yet a California resident when the Ferrari was originally delivered to Boden and initially depended upon the shop to perform the contracted work.

58. After Plaintiff's circumstances changed such that Plaintiff and his team could perform and supervise the work themselves, Plaintiff removed the Ferrari from Boden Autohaus.

59. Upon information and belief, Defendant was associated with Boden Autohaus during this period as a customer, business associate, and/or participant in its automotive community.

60. Following removal of Plaintiff's Ferrari, Defendant began posting unsolicited comments concerning Plaintiff and the vehicle on social-media accounts maintained by Plaintiff's **sponsors, business partners, and other automotive-industry contacts**.

61. Among other statements, Defendant publicly commented words to the effect of:

**"It's about time we stop using Boden for free storage."**

62. Defendant's choice of audience was significant. Rather than merely expressing his opinion privately or on his own account, Defendant inserted his commentary into Plaintiff's professional relationships by publishing directly before sponsors and industry contacts associated with Plaintiff and Button Built.

63. Plaintiff contacted Defendant directly and asked whether Defendant had a personal problem with Plaintiff that Defendant wished to address.

64. Defendant denied having a personal issue and represented, in substance, that he had simply observed Plaintiff's Ferrari remaining at Boden for an extended period.

65. Plaintiff explained directly to Defendant that Plaintiff had paid Boden substantial sums for work that had not been completed and that the Ferrari's extended presence resulted from the shop's failure to complete the work for which it had been paid.

66. Defendant therefore received Plaintiff's explanation directly from Plaintiff.

67. Defendant nevertheless continued making comments online.

68. Plaintiff subsequently encountered Defendant in person and confronted him concerning his continued online conduct.

69. Defendant again disclaimed hostility toward Plaintiff and represented that his comments were actually directed toward Boden because

Defendant himself had experienced a vehicle remaining there untouched.

70. Plaintiff instructed Defendant to cease involving himself in Plaintiff's professional affairs and move on.

71. Following that encounter, Plaintiff and Defendant had little or no meaningful direct communication.

72. Plaintiff subsequently encountered Defendant at automotive events, but Defendant did not personally confront Plaintiff concerning their prior disagreement.

73. Defendant nevertheless remained within the same automotive community and continued to know and interact with persons and companies within the professional network in which Plaintiff and Button Built historically operated.

74. This history is significant because, years before the publication giving rise to this action, Defendant already knew that Plaintiff's automotive reputation, sponsors, professional relationships, and public perception were integral to Plaintiff's livelihood.

### D. The 2021 Civil Allegations Devastate Plaintiff's Reputation

75. In July 2021, Plaintiff and his wife were named as defendants in a civil action filed in the United States District Court for the District of Nevada.

76. Among the allegations asserted against Plaintiff were allegations of sexual misconduct and sexual assault.

77. The allegations generated enormous national and international publicity.

78. Media and social-media coverage spread throughout the same automotive industry in which Plaintiff had developed his career, businesses, relationships, and reputation.

79. The allegations against Plaintiff have never been adjudicated at trial as true.

80. Plaintiff categorically denies those allegations.

81. Although Plaintiff categorically denies those allegations and they have never been adjudicated at trial as true, the widespread publicity itself produced catastrophic professional consequences.

82. Plaintiff lost professional relationships, sponsorship opportunities, business opportunities, his social-media presence, his reputation, and his ability to continue participating in the automotive industry as he previously had.

83. Plaintiff ultimately withdrew from the automotive industry and deleted his automotive social-media presence.

84. For approximately five years thereafter, Plaintiff remained largely absent from the industry while attempting to repair his reputation and rebuild personal and professional relationships.

**E. Plaintiff Finally Begins Rebuilding His Automotive Relationships**

85. By 2026, approximately five years after the events described above, Plaintiff had begun making meaningful progress toward restoring relationships and credibility within the automotive community.

86. Plaintiff was reconnecting with individuals and businesses with whom he had historically worked and developing renewed relationships within the automotive industry.

87. Plaintiff's return depended heavily upon professional reputation and word-of-mouth because Plaintiff no longer possessed the enormous public platform he maintained before 2021.

88. Renewed positive exposure of Plaintiff's historical automotive work therefore carried substantial professional significance.

89. The reappearance of one of Plaintiff's recognizable Ferrari builds through Barrett-Jackson presented precisely such exposure.

**F. The Ferrari F355 Returns to National Automotive Attention**

90. In approximately 2018, Plaintiff designed and built the extensively modified Ferrari F355 subsequently featured by Barrett-Jackson.

91. The Ferrari became one of Button Built's recognizable automotive creations and received substantial attention within the automotive community.

92. The Ferrari F355 was one of Plaintiff's recognizable Button Built vehicles.

93. Within the automotive industry and among enthusiasts familiar with Button Built, the Ferrari F355 was widely known and recognized as a Mitchell Button / Button Built build. Persons familiar with Plaintiff's work would understand Barrett-Jackson's publication of the Ferrari as featuring one of Plaintiff's recognizable professional creations, even though Plaintiff no longer owned the vehicle.

94. Among the relevant automotive-industry audience, including builders, sponsors, photographers, media accounts, collectors, event participants, and enthusiasts familiar with Button Built, the Ferrari F355 was recognizable as a Button Built build created by Plaintiff.

95. Members of the automotive community familiar with Plaintiff, Button Built, and Plaintiff's prior vehicle builds associated the Ferrari F355 with Plaintiff because of its distinctive appearance, prior public exposure, and history as a Button Built creation.

96. Persons familiar with Plaintiff, Button Built, and the Ferrari F355 would reasonably understand Barrett-Jackson's publication as

featuring one of Plaintiff's recognizable professional creations, even though Plaintiff no longer owned the vehicle.

97. Defendant knew this industry context. Defendant understood that automotive-industry participants viewing Barrett-Jackson's post would recognize the Ferrari as a Button Built build created by Plaintiff and would understand Defendant's "Epstein associates car" statement as referring to Plaintiff, the person publicly associated with that build.

98. The vehicle's reappearance through Barrett-Jackson therefore did not merely promote an automobile; it revived public attention toward one of Plaintiff's recognizable professional works.

99. Plaintiff no longer owns the vehicle.

100. The Ferrari nevertheless remains part of Plaintiff's professional history and continues to be recognized as a product of Plaintiff's automotive work.

101. In 2026, its current owner consigned the Ferrari for sale through Barrett-Jackson.

**G. Barrett-Jackson Promotes Plaintiff's Work**

102. On July 17, 2026, the verified Instagram account **@barrett_jackson** published a multi-image promotional post prominently featuring Plaintiff's Ferrari F355.

103. Barrett-Jackson's Instagram account has approximately **1.5 million followers**.

104. Barrett-Jackson's audience includes collectors, dealers, builders, manufacturers, sponsors, media accounts, photographers, event organizers, automotive businesses, and enthusiasts whose perception of Plaintiff's work and reputation directly affects Plaintiff's ability to rebuild professional relationships and economic opportunities.

105. Because Barrett-Jackson's publication featured a recognizable Button Built vehicle, the publication created renewed visibility for Plaintiff's prior work before an audience capable of producing future sponsorships, collaborations, commissions, media exposure,

consulting opportunities, event opportunities, and other automotive-industry business.

106. Barrett-Jackson announced that the Ferrari would be offered **No Reserve** at its Las Vegas Auction scheduled for **September 10–12, 2026**.

107. The publication therefore represented active promotion of Plaintiff's recognizable automotive work in advance of a major industry event.

108. The publication immediately generated substantial public engagement.

109. A true and correct screenshot of the Barrett-Jackson publication and its public engagement metrics is attached hereto as Exhibit C. At the time reflected in that screenshot, the publication showed approximately:

**2,100 likes;**

**24 comments;**

**45 reposts; and**

**310 shares.**

110. Those figures represented merely a snapshot of engagement while the publication remained active.

111. The hundreds of shares are particularly significant because they redistributed the publication beyond persons independently viewing Barrett-Jackson's Instagram account.

112. Defendant was part of that same automotive-industry audience and knew the Ferrari F355 was associated with Plaintiff and Button Built.

113. Barrett-Jackson also promoted the Las Vegas auction through its official X, YouTube, Facebook account and website and through promotional media concerning the September 10–12, 2026 auction.

114. Defendant used the phrase “Epstein associates car” as a proxy for the person associated with the build, not as a literal statement about the automobile itself.

**H. Defendant Deliberately Injects Jeffrey Epstein Into Plaintiff's Renewed Professional Exposure**

115. Defendant encountered Barrett-Jackson's publication.

116. Defendant recognized the Ferrari.

117. Defendant knew the Ferrari was associated with Plaintiff and Button Built.

118. Defendant knew that Plaintiff’s vehicles, including Plaintiff’s Ferrari builds, were recognized within the automotive community as part of Plaintiff’s professional identity and reputation.

119. Defendant therefore understood that a defamatory comment placed beneath Barrett-Jackson’s publication would not be understood merely as commentary about a vehicle, but as commentary attacking the person associated with that recognizable vehicle: Plaintiff.

120. Defendant knew Plaintiff had built it.

121. Defendant knew Plaintiff's history.

122. Defendant knew what had happened to Plaintiff's reputation beginning in 2021.

123. Defendant knew the extraordinary stigma associated with allegations of sexual misconduct.

124. Defendant nevertheless deliberately published:

**"Epstein associates car"**

125. Defendant's statement had nothing whatsoever to do with the Ferrari itself.

126. Defendant did not identify, accuse, or refer to the Ferrari’s current owner, consignor, seller, Barrett-Jackson, or any other person connected to the auction. The defamatory implication arose from Defendant’s knowledge that the vehicle was publicly associated with Plaintiff’s build history and reputation.

127. Defendant did not criticize its design.

128. Defendant did not criticize its engineering.

129. Defendant did not criticize its modifications.

130. Defendant did not criticize its condition, value, current owner, or auction estimate.

131. Instead, Defendant invoked **Jeffrey Epstein**.

132. Plaintiff has never met, worked with, socialized with, assisted, supported, or maintained any personal, professional, financial, or social relationship with Jeffrey Epstein.

133. The statement was directed at the identity and reputation of the person Defendant knew had created the vehicle: Plaintiff.

134. Defendant's words falsely communicated and/or implied that Plaintiff was an **"Epstein associate,"** was associated with Jeffrey Epstein, or possessed some actual connection with Epstein and the notorious sexual misconduct inseparably associated with his name.

135. Plaintiff has never been an associate of Jeffrey Epstein.

136. Defendant had no factual basis to identify Plaintiff as an Epstein associate.

137. Defendant's choice of words deliberately exploited the sexual-assault allegations publicized against Plaintiff beginning in 2021.

138. Defendant's meaning was further apparent from the circumstances of publication. Defendant personally knew Plaintiff and Plaintiff's vehicles; knew the Ferrari F355 was a Button Built vehicle created by Plaintiff; knew of the widely publicized sexual allegations

made against Plaintiff beginning in 2021; and chose the phrase "Epstein associates" rather than making any statement concerning the vehicle's present owner, seller, consignor, or Barrett-Jackson. In that context, Defendant's statement was intended and reasonably understood as a statement concerning Plaintiff.

139. Defendant's choice of publication location was equally calculated.

140. Defendant did not make the statement privately.

141. Defendant did not confine it to his approximately 3,500 followers.

142. Defendant inserted it directly beneath a Barrett-Jackson publication distributed through an account with approximately **1.5 million followers**, featuring Plaintiff's recognizable professional work, and being actively shared throughout the automotive community.

143. Defendant thereby selected precisely the audience capable of inflicting renewed damage upon Plaintiff's professional reputation.

### I. Defendant Knew Exactly Whom He Was Targeting

144. Defendant's publication cannot reasonably be viewed in isolation from his longstanding knowledge of Plaintiff.

145. Defendant had known Plaintiff for approximately nine years.

146. Defendant knew Plaintiff's automotive work.

147. Defendant knew Button Built.

148. Defendant knew Plaintiff's sponsors and professional network.

149. Defendant knew Plaintiff’s reputation, recognizable vehicles, sponsor relationships, public-facing automotive work, and industry goodwill were central to Plaintiff’s livelihood.

150. Defendant had previously demonstrated that knowledge by inserting commentary about Plaintiff and Plaintiff’s vehicles into social-media spaces connected to Plaintiff’s sponsors and business contacts.

151. Defendant therefore knew that attacking Plaintiff’s reputation in connection with a recognizable Button Built vehicle could foreseeably

damage Plaintiff's renewed professional relationships and economic opportunities.

152. Defendant had previously inserted derogatory commentary concerning Plaintiff directly into social-media accounts belonging to Plaintiff's sponsors and business contacts.

153. Plaintiff had confronted Defendant concerning that behavior years earlier.

154. Defendant therefore knew from personal experience that his online statements could reach Plaintiff's professional relationships.

155. By 2026, Defendant additionally knew that Plaintiff's reputation had already been devastated by widely publicized allegations of sexual misconduct.

156. Defendant therefore understood exactly what invoking **Jeffrey Epstein** in connection with Plaintiff would accomplish.

157. Defendant's statement was calculated to resurrect the most stigmatizing chapter of Plaintiff's life and attach it directly to renewed positive exposure of Plaintiff's professional work.

158. Defendant's publication was intentional, targeted, malicious, and undertaken with knowledge of its probable consequences.

**J. Defendant Deletes His Statement and Blocks Plaintiff**

159. Plaintiff discovered Defendant's publication through Instagram.

160. Plaintiff preserved a screenshot of the Instagram notification identifying Defendant's account, @norcal_lowlife5, and displaying Defendant's statement, "Epstein associates car." A true and correct copy of that screenshot is attached hereto as Exhibit A.

161. Plaintiff responded and challenged Defendant concerning the statement.

162. Defendant thereafter deleted the comment.

163. Defendant immediately blocked Plaintiff.

164. Plaintiff preserved evidence of Defendant's publication notwithstanding its deletion.

165. Defendant's deletion and blocking occurred only after Plaintiff confronted him.

166. Plaintiff alleges Defendant's conduct following confrontation as part of the totality of circumstances bearing upon Defendant's knowledge, intent, and state of mind and does not rely upon deletion alone to establish liability.

**K. Defendant Attacked Plaintiff at the Moment His Reputation Was Finally Recovering**

167. Defendant's timing substantially increased the foreseeable harm.

168. After approximately five years of reputational devastation and professional absence, Plaintiff's work was again receiving positive attention from the automotive industry.

169. Barrett-Jackson's audience includes collectors, builders, manufacturers, sponsors, dealers, media personnel, investors, event organizers, enthusiasts, and other automotive professionals.

170. These are precisely the categories of persons from whom Plaintiff historically derived professional opportunities and with whom Plaintiff had spent years attempting to restore relationships.

171. Defendant knew this.

172. Defendant nevertheless chose this moment to reintroduce sexual stigma into the public discussion surrounding Plaintiff's work.

173. Defendant's publication threatened to undo years of Plaintiff's efforts to restore his professional reputation and separate his automotive work from unresolved civil allegations made years earlier.

174. Defendant's conduct was deliberate and undertaken with actual knowledge of Plaintiff, Plaintiff's professional history, the importance of Plaintiff's reputation, and the devastating effect that associating Plaintiff with Jeffrey Epstein could foreseeably produce.

**L. The Reputational Harm Defendant Foreseeably Risked Began Materializing**

175. Defendant's publication did not occur in a vacuum. Within days after Defendant publicly characterized Plaintiff's recognizable automotive work as an "Epstein associates car," allegations of sexual criminality again appeared in public discussion concerning Plaintiff and the same Ferrari.

176. On or about July 27, 2026, an Instagram user identified as **@danirose74** responded to a public comment supporting Button Built beneath a post featuring Plaintiff's Ferrari and asked: **"convicted rapist no?"**

177. The statement was false. Plaintiff has never been convicted of rape or any other sexual offense.

178. Another user immediately responded that there had been "[z]ero evidence to go criminal" and explained that the allegations against Plaintiff arose from civil proceedings.

179. During the same public exchange, @danirose74 stated that the user was **not located in the United States** and had found the events difficult to follow.

180. The appearance of a false assertion of criminal sexual conviction in renewed public discussion surrounding Plaintiff's automotive work illustrates the concrete reputational danger foreseeably created by introducing accusations associated with sexual criminality into public discussion of Plaintiff's recognizable work.

181. Defendant published his statement into a highly networked social-media environment in which comments, posts, screenshots, rumors, and accusations are readily repeated, discussed, redistributed, and transmitted to additional audiences.

182. It was therefore reasonably foreseeable that Defendant's deliberate invocation of Jeffrey Epstein and the sexual allegations historically associated with Plaintiff would prompt further discussion, repetition, embellishment, and renewed dissemination of accusations concerning Plaintiff.

183. Plaintiff does not allege that Defendant authored the later "convicted rapist" statement. Plaintiff alleges that public exchange as evidence of the social-media environment into which Defendant injected the Epstein accusation and the foreseeable manner in which sexual-criminality accusations concerning Plaintiff can be repeated, distorted, and escalated.

184. The subsequent public discussion included a third party falsely questioning whether Plaintiff was a "convicted rapist," illustrating how sexual accusations concerning Plaintiff can be repeated,

distorted, and escalated in social-media discussions surrounding his automotive work.

185. The fact that the third-party commenter expressly indicated being outside the United States further demonstrates the reach of the renewed reputational harm and the capacity of social-media publications concerning Plaintiff's recognizable automotive work to spread beyond Defendant's immediate followers or Plaintiff's former domestic professional network.

186. A true and correct screenshot of this public exchange is attached hereto as **Exhibit C**.

## FIRST CAUSE OF ACTION

### Defamation / Libel Per Se

187. Plaintiff incorporates paragraphs 1 through 186 as though fully set forth herein.

188. Persons familiar with Plaintiff, Button Built, and the Ferrari F355 would reasonably understand Defendant's statement as referring to Plaintiff and Plaintiff's reputation.

189. The phrase “Epstein associates car” was reasonably understood as using Plaintiff’s recognizable build as a proxy for Plaintiff himself.

190. Defendant published the written statement **"Epstein associates car"** to third persons through Instagram.

191. The statement concerned and was reasonably understood as referring to Plaintiff because Defendant knew Plaintiff created the Ferrari and deliberately published the statement beneath a prominent publication of Plaintiff's recognizable professional work.

192. Defendant's statement expressly and/or by implication represented that Plaintiff was an associate of Jeffrey Epstein or otherwise possessed an actual affiliation or relationship with Epstein.

193. The statement and implication were false.

194. The statement falsely implied that Plaintiff was associated with Jeffrey Epstein, or with the criminal sexual exploitation and abuse publicly associated with Epstein’s name.

195. That implication was false.

196. Plaintiff has never been an associate of Jeffrey Epstein.

197. Defendant possessed no reasonable factual basis to state otherwise.

198. Defendant knew the statement and defamatory implication were false, acted with reckless disregard for their truth or falsity, and, at an absolute minimum, failed to exercise reasonable care in determining whether there existed any factual basis whatsoever for associating Plaintiff with Jeffrey Epstein before publishing the statement to third parties.

199. Defendant's statement was unprivileged.

200. Defendant's statement exposed Plaintiff to hatred, contempt, ridicule, obloquy, and the likelihood of being shunned or avoided and directly tended to injure Plaintiff in his profession and business.

201. Defendant's publication was especially damaging because Defendant intentionally placed it before the very professional audience upon which Plaintiff's restored automotive reputation and economic opportunities depended.

202. In the context alleged herein, Defendant's publication constitutes libel per se because it falsely associated Plaintiff with

Jeffrey Epstein and the infamous criminal sexual exploitation associated with that name and directly tended to injure Plaintiff with respect to his profession, trade, and business reputation. Alternatively, Defendant's publication constitutes actionable libel by implication and by reason of the circumstances and extrinsic facts known to Defendant and the audience to whom it was published.

203. As a direct and proximate result of Defendant’s conduct, Plaintiff has suffered reputational injury, humiliation, emotional distress, loss of professional standing, interference with his professional rehabilitation, and economic harm. The renewed appearance of false accusations of criminal sexual conduct in public discussions surrounding Plaintiff’s automotive work—including a third party publicly asking whether Plaintiff was a “convicted rapist”—constitutes concrete evidence that the same type of sexual stigma invoked by Defendant remains capable of circulating within and beyond the automotive community.

204. Defendant's conduct was malicious, oppressive, intentional, and undertaken with conscious disregard for Plaintiff's rights, entitling

Plaintiff to seek punitive and exemplary damages to the extent permitted by applicable law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Mitchell Taylor Button respectfully requests judgment against Defendant Page Rad as follows:

1) General damages according to proof;
2) Special and economic damages according to proof;
3) Punitive and exemplary damages to the fullest extent permitted by applicable law;
4) Plaintiff's recoverable costs of suit;
5) Prejudgment and post-judgment interest as authorized by law; and
6) Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated this July 29th, 2026

______________________________

Mitchell Taylor Button (Pro se)

# EXHIBIT A

## Defendant's Comment: Epstein Associates Car

we_the_buttons

All | People you follow | Comments | Follows | Tags & mentions

**Featured**

**juliankaiser01**, **evident.lee** and 41 others liked your post. 8m

**vintage_mcluvin** commented: back to old glory 🔥🔥🔥🔥 @we_the_buttons 58m

Reply

**vintage_mcluvin** started following you. 59m

Follow back

**ksrt_.97** commented: @ericeezyyy only drops bangers right before the weekend 🔥, hold your moola tight in the auctions 😂 2h

Reply

**Today**

**norcal_lowlife5** commented: Epstein associates car 21m

Reply

**_petewillbuildit**, **costafabrications** and 57 others liked your post. 51m

**boostscientist** commented: 🤯🤯🤯 2h

Reply Message

**toomanykeez** invited you to collaborate on a post. 2h

**toomanykeez** mentioned you in a post that's also shared to Facebook: NO RESERVE, just pure adrenaline. Who's ready to own a legend... more 2h

Message

# EXHIBIT B

## Defendant’s Profile


4:27
norcal_lowlife5
21
posts
6,845
followers
718
following
This is my 5th rodeo
@norcal_lowlife6
Huntington Beach
Followed by boostscientist, j_sherwin and 15 others
Follow
Suggested for you
See all
clowninonthehomie_...
clowninonthehomie_______
Follow
Riley Stair
riley_rsmotorsport
Follow
aannu978
aannu9788
Follow bac
This profile is private
Follow this profile to see their photos and videos.

# EXHIBIT C

## Barrett-Jackson Instagram Post

Posts
barrett_jackson

**barrett_jackson**
Las Vegas




1,872 22 44 268

Liked by **ferrpartsusa** and **others**

**barrett_jackson** Twin turbos change everything. This custom 1996 @Ferrari F355 is powered by a twin-turbocharged 3.5-liter V-8 engine paired with a six-speed gated manual transmission and is selling with No Reserve in Las Vegas! Ready to sell? Consign your vehicle for the Las Vegas Auction, Sept. 10-12 in the West Hall of the Convention Center.

Learn more with the link in bio.

# EXHIBIT D

## Barrett-Jackson Post / Wider Promotion

Posts
barrett_jackson

barrett_jackson
Las Vegas



1,872 22 44 268

Liked by **ferrpartsusa** and **others**

**barrett_jackson** Twin turbos change everything. This custom 1996 @Ferrari F355 is powered by a twin-turbocharged 3.5-liter V-8 engine paired with a six-speed gated manual transmission and is selling with No Reserve in Las Vegas! Ready to sell? Consign your vehicle for the Las Vegas Auction, Sept. 10-12 in the West Hall of the Convention Center.

Learn more with the link in bio.

# EXHIBIT E

## Barrett-Jackson Profile / Audience

← **Post**

**Barrett-Jackson**
@Barrett_Jackson

Twin turbos change everything. This custom 1996 @Ferrari #F355 is powered by a twin-turbocharged 3.5-liter V-8 engine paired with a six-speed gated manual transmission and is selling with No Reserve in #LasVegas!

Learn more: bit.ly/LV26TW-1996Fer...





7:00 PM · Jul 17, 2026 · **2.1K** Views